this foggy morning and trust that you were all boycotting the Super Bowl so there are no morning after problems here in this courtroom. Just a couple of words, we are familiar with the briefs and record excerpts but we appreciate record precise citations to the record since we probably haven't read the whole record before entering the courtroom today and also we have the traffic light system so when the yellow light comes on you have two minutes and when the red light comes on we ask you to conclude your argument as soon as you can unless you are answering a question from the court. The first case of the morning is 18-50895 Texas Retailers v. U.S. Department of Agriculture. We will hear first from Mr. Phan. Good morning. May it please the court. Dennis Phan on behalf of the United States. I have reserved five minutes out of my 24 rebuttal. Since 2011 there has been a long running litigation elsewhere over whether SNAP or that is food stamp records should be disclosed from 2005 to 2010. Once that litigation and ARIA's leader proceeded through the 8th Circuit resulted in a decision by the 8th Circuit, plaintiff brought this action to enjoin the government from following an order that was issued in that litigation. We think that interfering with ongoing litigation, interfering with court orders in ongoing litigation elsewhere and certainly ongoing litigation that has been pending for many, many years. Would you take that position if you had won, if you had lost in the 8th Circuit? Sorry about that, I don't know if that was me. That was I. We obviously did not take an appeal to the 8th Circuit, so we weren't a participant in the 8th Circuit. I know, but I'm asking you theoretically. There's this idea about comity, but one distinct phenomenon that's happened in the last two years is that there, every time let's say the executive branch of government does something immediately, five lawsuits are filed all around the country and sometimes they come out with varying results. If you had lost in the 8th Circuit, would you be such a big proponent of comity? Yes, certainly. I kind of want to point out two ways in which comity works in this situation. Then I want to get to the GTA Sylvania cases, which I think get to this exact issue. The first is if we had lost in the 8th Circuit just as we had lost after fighting an entire bench trial in South Dakota and we had decided to comply with the 8th Circuit's mandate, certainly we'd be here making those same exact arguments. I think the other way in which this works is a little bit more granular as to this case. In this case, there's 2005 to 2010 data, which is what the government's really disputing, and there's also the 2011 onward data. We think that this court in Texas is the first court that's been seized of the issues of whether the 2011 records should be disclosed, 2011 onward records should be disclosed. If another court elsewhere, if another set of lawyer requesters went to Nebraska or to Chicago or to New York and they came and they said, really, we don't like what the court in Texas is doing, we'd be making these exact same arguments. We'd be saying, no, the court in Texas is the one who's been the first that's been seized of these issues and gets to decide what to do with these records. Well, how come the IRS gets to litigate things over and over again? Well, that's because they're, I'm not sure exactly what type of IRS controversy, but I assume that's because they regard different litigants, and what this case regards is the same exact 2005-2010 documents. I think that's where the GTE Sylvania case has become very helpful because the Supreme Court has discussed exactly what to do in the reverse FOIA and FOIA context, and in those cases, the Supreme Court said, and there are two real lessons to draw from that. The Supreme Court said what to do about the timeline. It said, well, we can dismiss the later case. The later case can be dismissed even before the merits of the earlier case are fully resolved. And the merits of the earlier case in the GTE Sylvania cases were still under review by the Supreme Court, much as Argus Leader right now is still currently under review in the Supreme Court. Now, that doesn't matter. And then the second lesson we draw from the GTE Sylvania cases is that it doesn't matter that you disagree on the merits of what happened with the earlier filed case. It doesn't matter that, you know, you think that there are different arguments that could have been brought. You think that there are new facts that can be, are at issue. Those are things that are in the capable hands of another court, and right now, they're in the capable hands of the Supreme Court. And if a plaintiff or another trade organization wants to bring up those facts and wants to do so, they have every opportunity to do so. They can file an amicus brief in the Supreme Court. They could have done that in the Eighth Circuit. They could have— Now, of course, this case is— Did that do that? I don't know. No. That was not I. It was my machine that did that. I don't know. I don't know what this thing—oh, that's the clock. I'm thinking about tomorrow. I interrupted, or something interrupted. Oh, that's right. You did. I did lose my train of thought. Oh, the one distinction they draw in this case is that this one pertains only to Texas retailers. Was there a geographical limitation on the scope of, you know, publicity as to the Eighth Circuit decision? There was no geographical scope as to the publicity. I mean, the U.S. Department of Agriculture, during the Argus Leader proceedings, published a public request for information in the Federal Register. It contacted retailers, all the retailers within the SNAP network, by email and by telephone, notifying every single one of them that data might be disclosed in the course of the Argus Leader proceedings and that those proceedings might result in disclosure. And I think this only highlights why this sort of injunction is particularly inappropriate in this case, which is that these proceedings at Argus Leader were ongoing from 2011 onward. And, you know, plaintiffs, individual grocery retailers, knew about those proceedings at latest in August 2014 when USDA provided notice. Nonetheless, they waited until August of 2018, one day before the Eighth Circuit's mandate had issued, after the Eighth Circuit had made its decision, without participating in those Eighth Circuit proceedings, to bring this case to collaterally attack what was going on in a different court elsewhere. Okay. And what is your point there? What is your point? I think that points out just the equitable balance of what is going on. And I think plaintiff's harm reduces to what is essentially that another court might decide these issues, that another court has decided these issues, and if that was really their harm, they really should have raised those concerns with the other court. And sort of going back to Judge Jones's question about, well, you know, did the Argus case really resolve the Texas question? We think it did. I think a FOIA requester in anywhere, a FOIA requester in a newspaper in South Dakota can ask about documents in Washington. It doesn't have to be confined to your locality. A FOIA requester in Nebraska can say, what is going on in Texas? I think, you know, something about that is perhaps strange or odd, and I want to know more about that. What would you advise us to do in light of the cert grant by the Supreme Court? I assume they're going to hear the case this term, right? That's also what we anticipate. And you'll probably lose. We're not actually sure about that. I mean, we haven't, I mean, out of full disclosure to this court, we're considering participating as amicus in the Supreme Court proceedings, and we've held meetings  We don't have a bottom line that we're willing to disclose at this point. But at the same time, there are pending Supreme Court proceedings right now, obviously. And I think that there are three reasons why, and this court asked, you know, whether this case is ripe for review. And I assume that's based on the assumption that we should wait until the Supreme Court. Well, no, actually, the reason, that was my question, and the reason I wondered whether it was ripe is when the dispute is narrowed down to the potential impact on Texas retailers of this pilot program that you say will not go into a, won't even go into effect for two years. To me, that's the classic definition of a non-ripe dispute, and therefore non-adjudicable. So let me answer that question then first before kind of talking a little bit more about the interaction between this case and the Supreme Court proceedings. I think the fact that Texas, this program will not go into effect in Texas means that there's no need for a preliminary injunction. Now, to get a preliminary injunction, you need to show both irreparable harm, which we don't think really is the case here, but also you need to show that that harm is imminent, that that harm is going to come, you know. But that goes to the propriety, assuming the court has jurisdiction. Rightness is a reason for not adjudicating the case. It's one of the prudential reasons, along with mootness and standing and so on, isn't it? It is a prudential reason. I'm not sure if this court needs to think about it as a jurisdictional reason. I mean, certainly there could be a time. That's the way Justice Frankfurter would have understood it, I suppose. That may well have been as sort of a prudent exercise of the court's judicial power. And if the court is inclined to think that there's no reason to exercise power now, that only makes the preliminary injunction in this case all the more erroneous to have entered an injunction without any sort of real concrete discussion. Did you take federal courts at law school? Yes, Your Honor, I did. Okay. And so that only makes this sort of preliminary injunction all the more erroneous to have entered an injunction without any sort of real concrete  I don't know what is a concrete dispute. But the one thing I wanted to get back to as well is sort of the interaction about with this case and this case. Okay. So, I mean, what you are doing is saying that any suggestion that the case is not ripe should be disregarded. You haven't responded to that, really, have you? That the entire case is not ripe should be disregarded? Yeah. The entire case is not ripe because they're trying to prophylactically challenge the impact on them of a regulation that hadn't even gone into effect of a program that has. I mean, USDA has made a decision to comply with the court order. But I take the point being that that decision has not gone into effect because that decision might be, you know, the disclosure of that data might be years in the future or the harm from that. So you're saying it's a live dispute as to 2005 to 2010, even though you've agreed to write. Is that what you're saying? We do think there is a live dispute as to 2005, 2010. And partly maybe an example would help with regard to this. If the Supreme Court had, let's say, denied certiorari in this case, USDA would have simply disclosed the information. And so in that sense, they're seeking prospective preliminary injunction to stop that from happening. That disclosure could have happened earlier this year. Given the fact that the Supreme Court has accepted cert on this case and that it's likely to decide it this year, what is your position with respect to how we should treat this particular appeal? So three answers to that. The first, again, is the G.T. Sylvania cases. I think those lay out exactly what you do with the later filed case. You can get rid of the later filed case even before the merits . . . You can vacate and remand with instructions to dismiss. Is that what you're trying to say? You can certainly vacate and remand with instructions to dismiss. You can vacate the preliminary injunction to have the district court proceed in its own discretion. The government had asked for an opportunity to brief on motion to dismiss whether the 2005-2010 data was permissible, and the district court entered a stay instead. The second answer I have to that is . . . I kind of want to fight the premise a little bit. If we think that this case overlaps with the Supreme Court proceedings in Argus Leader, and we think it really does, because it involves the same exact 2005-2010 snap records, then the question isn't whether to wait. Once there is that sort of substantial overlap, this court and any other court would want to take steps to avoid that sort of conflict, not to entrench a preliminary injunction for longer than it needs to. And what would our judgment be that would accomplish the end that you are advocating? Your judgment could simply be to vacate preliminary injunction. We also don't think it would be error to vacate with instructions to dismiss. We don't think it would be . . . You know, there's various ways to say not inconsistent, consistent with this court's directions. Why would it not be more prudent just to hold it in abeyance in this court until the Supreme Court had decided the case? Because we don't know what the Supreme Court will do, and it may resolve the case or it may not resolve the case, and we would get rid of the case a whole lot quicker if we just kept it ourselves and waited to see what the Supreme Court did. Then we'd know what to do without an unnecessary demand. Two very quick answers. I mean, the premise of that is this case and what to do with these records is in the hands of the Supreme Court, and the Supreme Court is the court that is going to resolve what to do with these records. And so there is no reason for why this court would hold on to a preliminary injunction and keep a preliminary injunction that's erroneous . . . And dismiss the preliminary injunction but hold the remainder of the case. Can we do that? Or is it just here on the injunction? Yeah, you're only here on the injunction. I mean, you certainly . . . What is this actually enjoining you from? It's enjoining us from complying with court orders in other cases. But the Supreme Court stayed that, didn't they? The Supreme Court has recalled Eighth Circuit's mandate and stayed that mandate. But I think there's another point here, which is there is, we think, an ongoing harm to the judicial system when we allow courts to . . . What harm? Well, it's the same harm . . . No abstract harm. I want to know what the practical harm is. Well, it's the same harm as if another district court, now after this circuit ruled, had said, well, you know, we don't like what the Fifth Circuit is doing in this case. And so we're going to say something different and we're going to say, well, now it's two years later and we think that the facts have slightly changed and we're going to issue a different order. I see my time has remained. I think that is essentially the harm, which is to end-run the judicial system in that way. Thank you very much. All right, thank you. Mr. Powers? Thank you, Your Honor. May it please the Court, Jason Powers here for the Texas Retailers Association and its 20,000-member establishment who conduct 90 percent of the transactions in the SNAP program in the state of Texas. The data that we are talking about today comprise records, detailed records kept by the USDA of how much SNAP participants spend in each store that they frequent. For years, the USDA has published a great deal of information, copious data, about what is spent on SNAP each year in each state, in each county, sometimes in each zip code. But for the entire history of the SNAP program, for 40 years, USDA has kept individual stores' sales figures confidential. Why doesn't the public have a right to know? Your Honor, I think the public's interest in the way money is spent in the SNAP program is vindicated by the amount of information that the USDA— Well, I don't know. I mean, if it turns out that Kroger is allowing people in the food stamp program to purchase beer, why don't I have a right to know as a member of the public? Your Honor, the USDA already enforces those policy guidelines, and the public's right to have that information doesn't override the individual retailer's ability to protect that data. And the Freedom of Information Act, of course, doesn't invite courts to do this kind of balancing on a case-by-case basis. As the courts have instructed in the past, the legislature, the Congress— Let me tell you, I'm concerned with two or three things here. One of them is plainly ripeness as to your 2011 forward data. Another one is I don't understand how the district court had jurisdiction to do what it did because it can only get from point A to point B under the Trade Secrets Act, which it never even cited in its opinion. And this is a smart judge, and I'm very surprised that you're saying we should read between the lines. And the third one is I don't understand the competitive harm at all. Sure. So let's begin with the point about ripeness that Your Honor raised. The USDA, of course, has argued that the retailers have not demonstrated irreparable injury because USDA might not launch the online sales program until 2021, and they say, well, that means that the injury is not imminent. But that's not what imminence in this context means. The question is not whether the pain from the legal violation of our rights is imminent. The question is whether the event that will cause that pain is imminent, whether our legal injury is concrete and imminent, and here it is. We obtained the TRO when USDA was apparently within hours or days of releasing this data, and the release of the data in which the retailers have a confidentiality interest itself constitutes a legal injury. Once that data is out, there is no way to get it back. It may not hurt our pocketbook on day one once that data is out. What about 2011 forward? I'm sorry. Sorry, Your Honor. I'm sorry. Could you repeat that, Your Honor? I was talking about 2011 forward. Yes, for the 2011 forward data, surprisingly to us, once we filed this case, we found out that the USDA had made a decision to release the 2011 forward data without telling the retailers that they were going to release data in response to 23 undisclosed requests, requests by the USDA's own regulations they ought to have informed the retailers of but didn't, and they were planning on releasing that information but for the fact that this suit was filed. If we hadn't done that, we think we would have missed our chance, and essentially the die would have been cast. Our right to confidentiality would have been violated, and that right is what's in imminent danger, and I think that's why the case is ripe. Since USDA intended to release the data that was not at issue in the South Dakota court and intended to release it to requesters who had not been parties in the South Dakota court and was going to do it without warning in violation of their own regulations, if the retailers had waited for some sign that the USDA was going to violate their rights, they would have missed their chance, and that's why we have a hardship from having judicial consideration of our issues being withheld. What is the real complaint here? I guess this gets to Judge Jones' concern as well, but what is the real complaint the retailers had? What are they trying to protect? They're trying to protect the individual store sales data. In other words, trying to protect the individual stores who are violating the law from being revealed as having violated the law. Your Honor, I disagree. Then tell me what it is. The concern is that the use of this information by new online competitors poses a serious competitive threat to our members. The USDA audits this information. Well, tell me, like Judge Jones said, she didn't understand the competitive threat. Explain that to me. In 77024, where I live, we probably have five or six grocery stores, and everybody knows who they are, and it's not difficult for the online people, because they're very smart, to go into these stores and do an assessment as to whether food stamp customers are patronizing those stores. You do that two ways. Number one, you look at the customers, and number two, you look at what's stocked on the shelves. The portions of the affidavits that were cited in your brief were very speculative to me as how this would assist the great online dragon in the sky competitively. I think what the declarants have been talking about here is the increasing role of data analytics in the grocery business. And I know it seems counterintuitive to think about this, but the information itself ends up being the competitive arena. This is the grocery business where there is intense competition and very slim margins because we're all selling the same Oreos. We're all selling the same Dr. Pepper. We're all selling the same Raisin Bran. So what is it that allows you to do things like compete with the store next door on the basis of a few pennies difference in price? It's the ability to accurately analyze what products you're delivering. And then HEB can compete with Walmart better if it knows what Walmart, how much food stamp traffic Walmart has, right? Your Honor, that's exactly right. And one of the things that we identified in our declarations is the fact that if we were talking about just the world of HEB gets Kroger's information, Kroger gets Walmart's information, and there's reciprocity in the amount of data that you're getting, that would be a less compelling circumstance. What we're talking about here now is the arrival of the online provider. So then you go, and your theory is that they dispense everything by drones from some centralized warehouse in Nevada, and therefore you can't tell who they're selling to in your market. But that's not accurate. You just go to the Department of Agriculture and you ask them to break it down by zip code as well, right? Your Honor, at this point the data that's being requested is who is the seller and how much are they selling. I understand, and you can go and make similar requests. Can you not? You can make similar requests for pilot programs. Can you not? I don't know that we would be able to get information about the addresses of the customers who make the purchases, and I think there would be some concern about the confidentiality. Who's giving out addresses? Zip codes. Zip codes. Zip codes to which the products are shipped, Your Honor? Correct. Yeah, and I'm not sure that anybody has thought about it. What we have been asked to allow the USDA to share, or rather what USDA has been asked to share is, where are the purchases being made? And if we're talking about the Amazons of the world and the Fresh Directs of the world, those purchases are being made at a centralized facility. I think the USDA would treat very differently a request, tell us where the customers are. No one knows where our customers are either, but they know what our individual stores are selling. And I think that there would be real concern if the notion of the public interest in spending now getting to a point where we could seek as a FOIA matter what individuals are purchasing using their phone systems. Well, that's totally a straw man, the way you're recharacterizing what I said. Your Honor, I think one of the things that we were trying to really focus on here is the fact that this sales information is, at least as it's treated in the industry, confidential. And, of course, that's what FOIA is focused on, is this information that poses some possibility of competitive harm. This is information that's so valuable that people in the grocery industry can sell it for money and actually pay people to help them analyze it. And that's one of the things that our declarants talked about is the fact that they are able to sell individual store data to survey companies like Nielsen, who will promise to keep that information confidential, only release studies of it that are aggregated to a larger level than the individual store level. The market has voted with its feet to tell you that this information has value. Well, go on now. But you're getting back to arguing the Argus case, as best I can tell. And to be very blunt about it, I found your brief in regard to comedy almost offensive in regard to how little regard you had for the decision of coordinate federal courts. Your Honor, we obviously think it's important to have respect between the various courts here. No, I don't think your brief indicated much respect at all. You said, well, they just didn't have the facts before them, those idiots, and, well, they just didn't think about the future, and, well, they didn't think about the online competitive threat at all. Our concern is not that the judge in the South Dakota court got it wrong. I think the judge in the South Dakota court decided the case that was in front of her and the USDA's failure to present all those facts was a serious concern, but we have to accept that decision as it is. Now the question is, what do we do with a new competitive... Go find a new judge. That's what you do. Your Honor, I think we're trying to present what would be a change in circumstances, a change in facts. But you're not... You were just arguing to me. Everything that you were just arguing to me had very little to do with data analytics and all that. It had to do with the current competitive situation. It did not. And now you're trying to transform this into... metamorphose it into speculative about online retailing. The data analytics situation is uniquely tied to the online provider problem. This is... If we were just talking about Walmart's ability to deliver online products, it'd be a different case. But here we're talking about the arrival of Amazon and Fresh Direct and other online providers who use this data analysis program in ways that the existing retail market is still catching up to. And as we pointed out with our declarations, a lot of these people are paying substantial money for people to help them adopt these kinds of data analyst programs. Amazon's already there. Well, go back to my jurisdictional question. We have a preliminary injunction where the district court referred only to Section 4, or Exception 4 of the FOIA and never once to the Trade Secrets Act. And then, again, why can he have jurisdiction if the disclosure was required by law? And why doesn't that provision of the Trade Secrets Act fully apply to what happened in the Eighth Circuit? Your Honor, the district court's order does not cite the Trade Secrets Act. The court explicitly conducts its analysis under Exemption 4. And both the USDA and we agree that any document that is exempt under Exemption 4 is protected by the... Yeah, but if this were a diversity case and nobody mentioned the amount in controversy, we'd have to say that the district court lacked jurisdiction. In this case, Your Honor, we... And explain to me the Trade Secrets Act. It is required by law. Sure, and so on your first question, it was mentioned. The Trade Secrets Act and Exemption 4 linkage was mentioned in our petition... Sorry, our complaint, our motion for temporary restraining order, our motion for preliminary injunction. It got mentioned in all those places, and the DOJ takes the same position we do, that the analyses are exactly the same, and there was no need to call it out specifically. Now, to Your Honor's question about whether the authorized-by-law language in the Trade Secrets Act might encompass a court order, well, this was not something that was raised in the district court below. Well, I'm sorry, but we're interpreting the law. I do not see that as a matter of waiver. But there hasn't been briefing on the issue. What I would say is that... Well, that's because you didn't raise the Trade Secrets Act explicitly enough. But, I mean, it seems obvious to me because you agree that the Trade Secrets Act is the jurisdictional vehicle here. There is no standing to raise a reverse FOIA thing in and of itself, and therefore we have to look at the Trade Secrets Act and whether the disclosure was authorized by law. And I found your distinction that although that has been held to include discovery orders, that somehow it does include a final judgment by the district court in the Eighth Circuit. Your Honor, the point I'd make about this is that the Trade Secrets Act, when it says that a disclosure is prohibited except as authorized by law, that authorized-by-law language doesn't include... It is a legislative action, not a court order. The Chrysler case that the DOJ cites deals with this. It analyzes whether a regulation that's requiring disclosure could be treated as a law that could provide the necessary authorization by law to overcome the Trade Secrets Act. And in the Chrysler case, the U.S. Supreme Court concludes that a promulgated, substantive agency regulation amounts to a delegation of legislative authority. That has the force and effect of law, and that falls within the Trade Secrets Act language authorized by law. The Chrysler court specifically says that that doesn't apply to every action that's approved by an agency head. And the Justice Department hasn't cited a single case in which the Trade Secrets Act has been held to be overridden by an injunction. We don't even have an injunction here. A summary judgment. But you said it's been authorized by... It's applied to discovery orders. That's right, Your Honor. And those courts conclude that Rule 26 provides the necessary authorization by law. Not the order of court, but the Federal Rule of Civil Procedure, which is in the rule that's promulgated by the judicial branch and approved by Congress. And there is no sense, there is no prior case in which it's been said that the Trade Secrets Act allows any judicial authorization that happens to be the subject of an order from a district court somewhere. Your Honor asked about the comity questions, and let me address those specifically. The USDA has relied heavily on the Save Power case with respect to this doctrine of comity, saying that it's so important that the district court must avoid any kind of interference with another court. But respectfully, the case doesn't deal with the question presented here. The Save Power case is a relatively simple first-to-file case, where you've got one party that's facing two separate lawsuits dealing with the same facts, and the party moved to have the second suit transferred to the court that was hearing the first suit. Save Power doesn't apply here for several reasons, because first of all, the USDA did not ask for transfer below. They didn't ask for dismissal below, so the central holding in that case doesn't come up here. But even at the policy level, the case says nothing about whether the interest in comity is so important that it outweighs a court's ability to issue an injunction and preserve the status quo. So the point the USDA wants to make doesn't even come up in the Save Power case. I would—sorry, Your Honor, go ahead. I would, in fact, refer the court to the court's decision in Mann Manufacturing v. Hortex, which is a case in which the court ends up saying that a first-to-file court should be respected, but the Fifth Circuit specifically said that they agreed with the district court's decision to issue a preliminary injunction in the first instance and allow discovery in two parallel cases to proceed so that that court, or rather the first-file court, would be able to assess whether there was enough of an overlap so that it would be necessary for a transfer or dismissal to occur. Why is there not an overlap here? Your Honor, because we are addressing a different competitive market than the one that the South Dakota court considered. The South Dakota court was looking at the market as it existed—So every circuit has a different competitive market? Is that your theory? It's not just the geographic market. It's also the fundamental change that the USDA has created in the economic circumstances of the market. What about the argument that is made here that we should reverse the injunction even though it has no substantive effect on the present situation? I think, Your Honor, that doesn't really make any sense because right now, the only thing that's holding this in place is the Supreme Court's cert petition. If that were the case, the USDA would apparently be willing to just release this information without any further warning or discussion. At this point, we think it would make more sense since we don't know what the Supreme Court is going to do for the Fifth Circuit. The question I guess I have in reverse is how are you being harmed now by the injunction? They're not. They won. No, Your Honor. We're happy with the way things are at the moment. If the Fifth Circuit were to hold this matter in abeyance until the end of the Supreme Court proceeding, I think that would be... You would be harmed absent the injunction at this time. What we would be facing is the risk that the cert petition would be denied and we would not have an opportunity to present our case that there are new circumstances that change the outcome. But they granted cert on an issue of law and you're not... I mean, come on. I mean, based on Justice Thomas' dissent several years ago, there seems to be more than a fair probability that the court will hold that the substantial competitive harm thing is not a valid interpretation of the law, right? I think that's a real possibility. In which case, no doubt they will vacate and remand to the Eighth Circuit. And if that were to occur, then I think under this Circuit's precedent, it would be a question that the District Court had to decide, are these cases now overlapping at a point that I no longer have a separate case here in Texas? The District Court should decide that. Not us? Your Honor, I think that the question of the factual overlap is a question that is basically a fact question, because in this case the issue is have the economic circumstances changed to the point that we have a new issue to decide. So every year you can make up a new issue. Okay. Thank you. Your Honor, I think the District Court's... You have your red light. Thank you. Thank you, Your Honor. Mr. Phan. Thank you, Your Honor. I want to make three very quick points. One, there was a question of whether there's any precedent about court orders being authorizations by law under the Trade Secrets Act. The answer to that is there is Blair v. Osterlein by the Supreme Court, 275 U.S. The pin site is 227, says that actions taken by agencies in obedience to lawfully issued judicial process or process issued in a lawful judicial proceeding are authorizations by law. And you can kind of see that through the structure of the Trade Secrets Act itself, which Judge Jones, you mentioned, the District Court never mentioned in its brief, in its order, which is a direct violation, we think, of Chrysler v. Brown. But in addendum, page A2, you can see that there's two parts to the Trade Secrets Act. There's what is the prohibited disclosure, and that's what really we're talking about. It's disclosures that are not authorized, and then there's the substantive scope of the Trade Secrets Act, which is what is the body of records. And so we're really arguing about that first element, and that's something, again, that the District Court, if it had done a proper Trade Secrets Act analysis, would have gone through an element-by- element analysis through the Trade Secrets Act. The second point I want to make is that we agree that all the sort of arguments here about harm to Texas retailers, about the online market, those are things that are routinely raised in amicus briefs. They're routinely raised in amicus briefs before the Supreme Court. In fact, numerous other grocery organizations and trade organizations have participated in the Supreme Court proceedings. And so I think that really hones in on the harm. If there is any assertion of harm, it is that the Supreme Court might ultimately agree that these documents need to be disclosed, that these historical 2005-2010 documents need to be disclosed. And we don't think that's a really cognizable sort of harm to say that the Supreme Court might entirely dispose of an issue in front of it. That is a natural consequence of having the Supreme Court decide an issue and not a harm to plaintiffs. And the third point that I want to make very quickly is I had misunderstood Judge Jones's question. Yours is about 2011 onward data. And I heard plaintiffs' counsel say that USDA was planning to disclose that data, and we're about to disclose that data. We do think that there are significant issues with that cause of action, with that claim, with the 2011 onward data, including the fact that there is no, and maybe you talk about this in terms of ripeness, but we think there's no final agency action, which is another sort of jurisdictional bar that doesn't get you to relief. And there is no final agency action because if you look at 7 CFR 1.12, it walks you through exactly what the USDA would be doing to disclose the data, and it would be doing the same things that it did in this case, or it did in Argus Leader, rather, with 2005-2010 data. Let me ask you a question. If I am correct,  the judgment in the, is it correct that the complaint, quote, mentions the Trade Secrets Act? The complaint mentions the Trade Secrets Act more than once, and it certainly mentions it in the claim, you know, as part of the claim for relief. We don't think it's clear, the complaint doesn't make clear how the Trade Secrets Act interacts, and certainly all the briefing in this case, I think plaintiffs have interpreted that to mean it's just a FOIA Exemption 4 case, and we know Well, it seems to me that, I mean, they don't disagree with you that whether this disclosure is authorized by law is a key to a ruling under the Trade Secrets Act, right? But that, but that issue was not joined in the District Court at all, right? That is correct. Yeah, the District Court did not make So is it a jurisdictional flaw or a legal flaw that the District Court did not use the proper scheme of reasoning in order to approach the question? We certainly think it's a certainly think it's a legal flaw under Chrysler to not even mention the Trade Secrets Act, which Chrysler said you couldn't do. To the extent that this Court reads the complaint, and the complaint is found at page 6 of the record, and thinks that it doesn't actually plausibly state anything under the Trade Secrets Act, that it only plausibly states essentially that it disagrees with another court's FOIA decision, and all it says is that Exemption 4 should be the analysis, then we agree with you that the complaint doesn't state a right to action because Chrysler says you don't have any right to enjoin. You don't have a cause of action under FOIA. You can't bring an APA suit to enjoin somebody under FOIA. So to the extent that the Court looks to the complaint and says that that's the issue, then we would agree. I see my time is up. Thank you.